IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KURT FREITAG,                                    No. 3:17-cv-00865-HZ

            Plaintiff,

      v.

ALASKA AIRLINES, INC., an Alaska                 OPINION & ORDER
corporation, PORT OF PORTLAND, a
municipal corporation, ERIN FLINN,
an individual, and DOES 1 and 2,
individuals,

            Defendants.


Mark C. Hoyt
Tobias N. Tingleaf
SHERMAN SHERMAN JOHNNIE & HOYT, LLP
693 Chemeketa Street NE, P.O. Box 2247
Salem, Oregon 97308-2247

      Attorneys for Plaintiff

/ / /

/ / /


1 - OPINION & ORDER

Caryn Geraghty Jorgensen
John Fetters
MILLS MEYERS SWARTLING P.S.
1000 Second Avenue, 30th Floor
Seattle, Washington 98104

Attorneys for Defendant Alaska Airlines, Inc.

Peter R. Mersereau
Beth F. Plass
MERSEREAU SHANNON LLP
One S.W. Columbia Street, Suite 1600
Portland, Oregon 97258-2089

Attorneys for Defendants Port of Portland & Erin Flinn

HERNANDEZ, District Judge:

Plaintiff Kurt Freitag brings this 42 U.S.C. § 1983 action against Defendants Alaska Airlines ("Alaska"), the Port of Portland, ("the Port"), Port Police Officer Erin Flinn, and Does 1 and 2 who are identified only as Port police employees. Plaintiff brings a Fourth Amendment unlawful arrest claim and a First Amendment retaliation claim against the Port and Flinn. He brings a state law false arrest claim against all Defendants. He also brings a breach of contract claim against Alaska. The claims are based on Plaintiff's arrest at the Portland Airport on May 20, 2015, which occurred when he did not leave the secure area of the airport terminal after losing his seat on an Alaska flight. Alaska moves for summary judgment. The Port and Flinn also move for summary judgment. In response to Alaska's motion, Plaintiff concedes the breach of contract claim. Pl. Resp. 39, ECF 28. I grant Alaska's motion as to the breach of contract claim, I grant Alaska's motion as to the false arrest claim, and I grant the Port Defendants' motion as to all claims.

/ / /

On May 12, 2015, Plaintiff, or someone on his behalf, purchased a round-trip Phoenix to Portland to Phoenix ticket on Alaska. He flew to Portland on May 19, 2015 and had a return flight for May 20, 2015. According to Ray Prentice, Alaska's Director of Customer Advocacy, Plaintiff purchased a coach-seat, upgrade-qualifying fare. Prentice Decl. ¶ 2, ECF 26; *see also id.*, Ex. A (copy of Plaintiff's "Passenger Name Record" or "PNR" which Prentice states shows the type of fare purchased by Plaintiff). Prentice further states that as an elite MVP 75k Gold customer, Plaintiff received an automatic first-class upgrade for both flights. Prentice Decl. ¶ 2. Plaintiff denies knowing that he had a first-class seat. Tingleaf Decl., Ex. 1 ("Pl. Dep."[1]) 85:19-86:12, ECF 29-1 (Plaintiff stating that he "can learn it if I'm paying any attention. Sometimes I'm not.").

Under Alaska's Contract of Carriage, passengers must check in at the ticket counter at least forty minutes before departure and be at the departure gate at least thirty minutes before departure. Beyer Decl., Ex. A at 27 (Rule 135AS), ECF 22-1 at 28. The Contract of Carriage allows Alaska to cancel a ticket if a passenger fails to occupy a reserved space or fails to comply with any term or condition of sale. *Id.* at 26-27.

Plaintiff's May 20, 2015 flight from Portland to Phoenix had a scheduled departure time of 8:30 p.m. Fetters Decl., Ex. A ("Olson Dep."[2]) 61:2-22, 70:6-9, ECF 21-1; Prentice Decl. ¶ 3.

---

[1] Excerpts of Plaintiff's deposition were provided by multiple parties. Plaintiff's deposition excerpts attached to Tingleaf's Declaration are referred to as "Pl. Dep." Plaintiff's deposition excerpts attached to Fetters's Declaration are referred to as "Freitag Dep."

[2] As with Plaintiff's deposition, there are multiple excerpts of Olson's deposition. I refer to Olson's deposition excerpts attached to Fetters's Declaration as "Olson Dep." I refer to Olson's deposition excerpts attached to Tingleaf's Declaration as "Olson Dep. - Pl."

Plaintiff's bag was checked at the Portland airport ticket counter at 7:55 p.m., five minutes after the forty-minute cutoff. *Id.*; *see also id.*, Ex. A at 5. Plaintiff asserts that he arrived at the Portland airport one hour before the scheduled departure but he does not dispute that he checked his bag only thirty-five minutes before that time. Pl. Resp. 3-4.

Alaska asserts that because Plaintiff missed the forty-minute cutoff, his complimentary first-class upgrade was released and reissued to another elite customer on Alaska's upgrade waitlist. Prentice Decl. ¶ 3. At the check-in counter, Plaintiff was issued a "gate-service document," allowing him to pass through Transportation Security Administration (TSA) security, but unlike a boarding pass, it did not contain a seat assignment. *Id.* If Plaintiff arrived at the departure gate on time, he would have been issued an available coach seat assignment at the gate. *Id.* Plaintiff testified in deposition that during the check-in process, nothing was said to him about being late. Pl. Dep. 98:25-99:3. The ticketing agent at the check-in counter gave Plaintiff a baggage claim tag with a "V/S" on it. Prentice Decl., Ex. B. A "V/S" tag indicates that a passenger may be separated from his or her checked luggage if either fails to make it to the aircraft in time. Prentice Decl. ¶ 4. Plaintiff testified he knew nothing about the "V/S" tag and the agent said nothing about possibly being separated from his bag due to timing. Pl. Dep. 104:19-25. The ticketing agent called the gate agents to tell them that Plaintiff was being sent to the gate late.[3] Olson Dep. 44:14-20.

---

[3] An unidentified document provided to Plaintiff by Alaska in discovery and represented to be a written account by an eyewitness to some of the events of May 20, 2015, indicates that the document's author (who appears to be a gate agent), received a call from the ticket counter at about thirty-five minutes before departure to state that Plaintiff was on the "OS" (referring to "open seat") list and was on his way to the B1 gate. Tingleaf Decl., Ex. 3, ECF 29-3. According to this document, Plaintiff's first-class seat was not actually given to the next customer on the upgrade list until he failed to show up at the gate thirty minutes before departure. *Id.*

Plaintiff testified in deposition that after clearing TSA security and approaching the flight gate, he observed eight to ten people in the boarding line.  Fetters Decl., Ex. B ("Freitag Dep.") 105:19-22,106:25-107:2, ECF 21-1.  Because he prefers to be the last person to board, Plaintiff went to a vendor to purchase newspapers and soft drinks.  *Id.* at 107:4-5, 107:19-20.  He returned to the gate and there were still a couple of people in line.  *Id.* at 107:24-108:2.  Plaintiff then "hung back a little bit and let them complete the thing" before pulling his "ticket" out of his pocket and making his way to the boarding scanner.  *Id.* at 108:3-6.  According to Alaska, Plaintiff scanned his gate-service document seventeen minutes before departure, or at 8:13 p.m.  Tingleaf Decl., Ex. 2 ("Olson Dep. - Pl.") 108:19-22, ECF 29-2.

Because Plaintiff had only the gate-service document without a seat assignment, the scanner would not let him board.  Olson Dep. 150:12-151:5; Pl. Dep. 114:23-115:2.  According to Alaska, Plaintiff was told that he lacked a seat assignment because his first-class upgrade had been reassigned to another passenger due to his late check-in.  Tingleaf Decl., Ex. 3.  Plaintiff allegedly became "quite upset."  *Id.*  Plaintiff testified that the gate agent did not mention the "lost" first class ticket and did not offer Plaintiff a coach seat.  Pl. Dep. 120:25-121:6.  According to Plaintiff, the gate agent, and another gate agent who joined the first agent, kept mentioning "miles."  *Id.* at 117:12-13, 118:12-14, 122:3.  Plaintiff assumed that the flight was overbooked and that the agents were going to offer him miles to be used for a future flight.  *Id.*

According to the unidentified declarant gate agent's account of the events, Plaintiff went to the counter to talk to the declarant afer the scanner rejected Plaintiff's boarding document.  Tingleaf Decl., Ex. 3.  Contrary to Plaintiff's testimony, the gate counter agent states that he or she told Plaintiff that his first class seat had been given to another passenger.  *Id.*  Plaintiff was

upset, stating that he had reserved a seat two months prior, and stated that he had checked in on time. *Id.* The gate agent offered Plaintiff miles or money toward a future flight. *Id.* Plaintiff was not interested. *Id.* He became "quite upset" and began to "berate" the gate counter agent. *Id.* (stating that Plaintiff said something like "how can you treat someone like this"). In his Response Memorandum Plaintiff asserts that he did not yell at, threaten, or berate the gate counter agent. Pl. Resp. 6 (citing Pl. Dep. 190, 195). In the cited deposition testimony, Plaintiff states that in his exchange with the gate individuals, he was not angry and did not raise his voice. Pl. Dep. 190:4-14. He characterized his behavior as "frustrated and confused, perplexed by the situation." *Id.* at 190:14-19. He also denied using swear words or vulgar or profane language. *Id.* at 195:7-12.

The gate agent called a supervisor, Michelle Olson, to assist with the situation. Olson Dep. 45:2-4 (stating that boarding agent Laura Coleman[4] called Olson up from the jetway). Olson was at the bottom of the jetway for the flight and received the agent's call twelve minutes before departure. *Id.* at 33:25-34:1. Olson walked to the gate to speak with Plaintiff.

Cary is a customer service agent for Alaska. Tingleaf Decl., Ex. 5 ("Cary Dep.") 14:13-18, ECF 29-5. She does not recall much about the incident with Plaintiff on May 20, 2015. *Id.* at 15:14-23 (testifying that she doesn't "necessarily recall the incident" but she "was shown a few printouts that had my name on it that maybe jogged a few memories, but I do not recall the event."). What she does recall is Olson, Cary's direct supervisor, coming to the gate because of an escalating incident. *Id.* at 28:21-29:5.

---

[4] Since the events in this case occurred Coleman changed her last name to Cary. Tingleaf Decl., Ex. 5 ("Cary Dep.") at 11:3-10.

Olson testified at deposition that she had been told of an irate passenger who wanted to speak with a supervisor. Olson Dep. 49:1-3. When Olson approached, there was no indication of irate behavior and Plaintiff was standing and waiting quietly for her. *Id.* at 48:14-22. Olson recognized Plaintiff as someone who flies Alaska frequently and she used Plaintiff's name and approached with a smile to "diffuse anything that was happening." *Id.* at 49:5-10; 45:16-23, 46:6-10. Olson explained to Plaintiff that his first-class upgrade was released to another passenger because of his late check-in at the ticket counter and he could either accept a coach seat or a refund. *Id.* at 38:6-39:6, 115:6-18, 120:4-21. According to Olson, Plaintiff denied he was late and continued to demand a first-class seat. *Id.* at 50:1-3, 53:25-54:1, 55:25-56:2, 87:14-15. At this point, Olson states, Plaintiff was not shouting or throwing things but he nonetheless he was not calm and was insisting that "this is my first class seat," "I'm not getting on without my first class seat." *Id.* at 55:3-9 (further stating that Plaintiff was "not really in the mode to listen to options"). Plaintiff did not want a coach seat. *Id.* at 39:23-24. Olson testified that because the plane was so close to its departure time, she had only a few minutes to get Plaintiff onboard. *Id.* at 100:17-20. She tried to appease him but was also trying to get the flight out on time. *Id.* at 110:19-20. She offered him any coach seat on the plane. *Id.* at 100:20-21. Plaintiff did not take one but he eventually agreed to a refund. *Id.* at 103:10-13.

According to Olson, within three or four minutes of interacting with Plaintiff, and while she was processing his refund request, Plaintiff began to make inappropriate comments to her, including that she should kill herself. *Id.* at 40:4-9 (testifying that Plaintiff repeatedly said he was not sure how Olson could live her herself, how she could go home at night and sleep, and that she should just go home and kill herself); 124:7-15. Olson began to feel that the situation

was unsafe. *Id.* at 40:7-9. She knew that after she completed processing his refund, Plaintiff would no longer be a ticketed passenger and could not remain in the secure area of the airport. *Id.* at 40:12-14, 103:14-104:5[5]. Because she did not feel safe escorting Plaintiff out of the secured area, she called the Port police. *Id.* at 103:14-104:5, 138:17-24. She called the non-emergency line and asked the Port police to escort Plaintiff from the gate area. *Id.* at 129:5-11 (testifying that she called the non-emergency line when everything was done with the refund and he needed an escort). According to Olson, Plaintiff continued to "run on" with dialogue as to Olson's "worthlessness and need[] to kill herself" while waiting for the Port police to arrive. *Id.* at 40:16-20. Plaintiff denies that he called Olson names or threatened her in any way. Pl. Resp. 8.[6]

Port police officer Flinn received a call from dispatch at 8:22 p.m., reporting a disturbance at an Alaska boarding gate. Fetters Decl, Ex. C ("Flinn Dep.") 17:17-18:7, ECF 21-2; *see also id.* at 20:21-21:7 (Flinn received a call at 8:22 of an incident with an irate male at Alaska boarding gate number B1). She went to the area with Officers Klein and Brown. *Id.* at 22:7-8. Flinn was the lead officer. *Id.* at 23:13-18. When the officers arrived on scene, they saw Plaintiff and Alaska personnel, all of whom were "standing around." *Id.* at 24:8-13, 25:2-4. According to Flinn, Plaintiff "appeared to be agitated with the situation[.]" *Id.* at 27:1-2. Flinn

---

[5] Plaintiff asserts that the refund was not processed until three days later. Pl. Resp. 7. But, the exhibit Plaintiff cites in support shows only that the refund was *paid* to Plaintiff on May 23, 2015. Tingleaf Decl., Ex. 7. That it was *paid* on that date does not contradict Olson's testimony that she "processed" the refund at the time of the incident on May 20, 2015.

[6] The cited testimony is that Plaintiff did not describe any Alaska employee as worthless and did not use swear words or vulgar or profane language. Pl. Dep. 195:3-12. The testimony does not actually state that Plaintiff did not call Olson names or threaten her.

needed to investigate further to determine if it was "more a customer service-type situation or not." *Id.* at 27:3-5.

Flinn initially spoke with Olson. *Id.* at 24:21-23, 27:18-20. Flinn recalls Olson telling her that Plaintiff was not going to be flying on the Phoenix flight and he was not ticketed. *Id.* at 29:15-19. Olson told Flinn that Plaintiff had previously been excluded from flying on Alaska some years ago. *Id.* at 30:4-7; *see also* Flinn Decl. ¶ 6, ECF 24 (stating that during her initial conversation with Olson, Olson told her that she had dealt with Plaintiff on previous occasions during which he had become aggressive with Alaska employees and that he had been previously excluded from flying on Alaska); Tingleaf Decl., Ex. 9, ECF 29-9 (Flinn's police report stating that Olson told her that Plaintiff had previously been placed on a "no fly" list for Alaska due to erratic behavior). During deposition, Olson admitted that she was aware that Plaintiff had previously been temporarily banned from flying with Alaska but she did not actually know what caused the ban. Olson Dep. - Pl. 129:12-132:12 (further explaining that she made an assumption based on his being on the no-fly list and stating that "we don't put somebody on that list just because").

In describing the immediate issue, Olson told Flinn that Plaintiff arrived late for the flight, Alaska had offered him a seat in coach, Plaintiff was not happy and had demanded his first class seat, and that he had had erratic behavior. Flinn Dep. 30:12-16; *see also id.* at 31:6-12 (Olson told Flinn that Plaintiff had arrived at the airport thirty-five minutes before the flight departure time and had arrived to the gate area eleven minutes before that time); Flinn Decl. ¶ 6 (Olson told Flinn that Plaintiff had checked in late at the Alaska ticket counter, had arrived to gate B1 roughly eleven minutes before the flight, was advised that his first class seat had been

given away because of late arrivals, that accommodations had been offered to Plaintiff but he had refused them and began calling Olson names, including telling her she was worthless, and that as a result, Plaintiff had become a non-ticketed passenger and was not boarding the flight).

Flinn knew from Alaska that Plaintiff did not have a boarding pass. *Id.* at 33:14:21. She testified in deposition that when the airlines choose not to fly a passenger and remove the boarding pass or the passenger's access to the airlines's business, that means the person is no longer a ticketed passenger. *Id.* at 34:11-15.

After talking to Olson, Flinn spoke with Plaintiff. *Id.* at 43:8-9. According to Plaintiff, he was asked to place his luggage down. Pl. Dep. 134:18-22. Flinn states that in her initial contact with Plaintiff, he was agitated. *Id.* at 43:12-14; *see also* Flinn Decl. ¶ 7 (when she approached Plaintiff, Flinn explained why she had been dispatched to the gate and he immediately became argumentative). He was demanding to see all of the Alaska employees' identifications. *Id.* at 13-15. Flinn described Plaintiff as interrupting any kind of conversation she was trying to have to tell him why she was there. *Id.* at 43:21-25 (also explaining that he kept referring back to Alaska and turning and speaking with them in a louder and agitated tone). She stated: "He seemed to be unreasonable at that point whereas he wasn't taking any direction from anyone." *Id.* at 43:25-44:2. Flinn testified that in her dealings with Plaintiff, he "seemed very unreasonable and unwilling to listen to anybody else's point of view," that he "demanded things, and there was no real reasoning with him." *Id.* at 31:2-5.

According to Flinn, Plaintiff was not taking an aggressive stance or screaming at the top of his lungs, but he was raising his voice. *Id.* at 44:3:9. Plaintiff "wanted his first class seat." *Id.* at 44:20. He made statements such as they are "refusing to fly me. They are worthless. I want

all their information.  I'm filing a complaint."  *Id.* at 45:10-15.  Flinn tried to walk Plaintiff

through some of the steps for filing a complaint but Plaintiff was "unwilling to hear anybody else

at that point."  *Id.* at 45:16-19.  Plaintiff denies stating that he was going to file a complaint.  Pl.

Dep. 197:9-12.  He states that he was unable to tell his side of the story to Flinn.  *Id.* at 139:15-

140:7 (Plaintiff deposition testimony to the effect of what, in his opinion, is good policing which

"didn't happen" and stating that "[w]e never got to anybody's story. . . .  and it went "very, very,

very rapidly . . . to my being arrested.").

    Flinn asked Plaintiff for his identification.  Flinn Dep. at 43:15-16.  Plaintiff initially

refused.  *Id.* at 43:16-17; *see also* Pl. Dep. 134:23-24, 135:8-10 (stating that he found the request

to show his identification "a little aggravating" and thought the request was "inappropriate").

Plaintiff asked Flinn for her identification.  *Id.* at 46:16-21.  Flinn's security badge is pinned to

her uniform and she responded to Plaintiff by pointing to her chest and her badge and stating

"[i]t's right here."  *Id.* at 46:24-47:2.  The badge shows Flinn's full name.  *Id.* at 47:7-8.  Plaintiff

remained argumentative about the issue.  *Id.* at 47:8-9.  Plaintiff then took out his identification

and put it up to his chest instead of handing it to Flinn so she could write down his information.

*Id.* at 47:10-13.  She normally does not get close enough to a person who is agitated to have been

able to read the information on Plaintiff's identification but she had cover officers there and felt

okay with obtaining Plaintiff's information from the identification Plaintiff was holding to his

chest.  *Id.* at 47:15-22.  Thus, in response to Plaintiff's action, Flinn said "[t]hat's fine."  *Id.* at

47:15-16.  Plaintiff testified that he believed the other officers were not going to say who they

were.  Pl. Dep. 135:19-21.  Plaintiff moved to look at the name badge of one of the other officers

and testified that the second other officer responded by telling Plaintiff that he could not be

"going for his gun." *Id.* 13:13-25.

Based on the information she had from Alaska, Flinn told Plaintiff he no longer was welcome to fly on Alaska and had no current ticket.  Flinn Dep. 48:20-23; *see also* Flinn Decl. ¶ 8 (Flinn told Plaintiff that Alaska told her that he no longer had a current ticket on the Phoenix flight and as a result, he was a non-ticketed individual in a secure area of the airport).  In his deposition testimony, Plaintiff states that Flinn did not tell her he was no longer welcome to fly. Pl. Dep. 200:15-24.  Flinn states that she told Plaintiff multiple times that he had to leave.  Flinn Dep. 48:24-49:1.  Based on the knowledge she obtained from working in the airport for a very long time, Flinn knows that individual airlines lease their space from the Port and at that point, Alaska had denied him boarding and he no longer had "any ticket to fly." *Id.* at 49:5-12; *see also* Flinn Decl. ¶ 8 (without a valid ticket, he had no continuing legal right to be on premises designated as a secure area of the airport).  She asked Plaintiff to allow her to escort him off of the concourse because he had no current boarding pass. *Id.* at 49:13-16.  In front of Plaintiff, she again confirmed with Alaska he was not going to be flying with Alaska. *Id.* at 49:17-20. Plaintiff, however, was "unwilling to leave the counter area in the secured area.  There was no reasoning with him." *Id.* at 49:25-50:2.  According to Flinn, Plaintiff's flight was either just about ready to leave or had left. *Id.* at 35:12-16.

Flinn explained to Plaintiff that he needed to leave the concourse or he would be arrested for trespassing.  Flinn Decl. ¶ 8.  He was free to leave at any time. *Id.*  Plaintiff ignored her and continued to argue about getting information about the Alaska employees. *Id.*  Flinn testified that after asking Plaintiff several times to leave voluntarily and telling him the consequences of not leaving the secured area when he had no boarding pass, Plaintiff then asked Flinn to arrest him

by stating "[j]ust arrest me."  *Id.* at 54:25-55:8; *see also* Flinn Decl. ¶ 8 ("I told him two more times that he no longer had a current ticket through any airline, and would have to leave the concourse or be arrested for trespassing.  He then stated 'Fine, just arrest me.'").  She then placed him under arrest for second-degree trespass in violation of Oregon Revised Statute § (O.R.S.) 164.245(1).  Flinn Decl. ¶ 9.  He was placed in handcuffs and escorted to a transport vehicle.  *Id.*

Plaintiff denies being told that he was trespassing.  Pl. Dep. 141:9-12; *see also id.* at 140:8-12 (one of the officers said only "are you leaving or not?").  He denies that any Alaska employee told him he had to leave the secure area of the airport.  *Id.* at 192:9-14.  As for the police, they said only "so, are you gonna leave?" *Id.* at 192:15-19.

In deposition, Flinn explained that Plaintiff was committing a crime when after being told that Alaska was denying him travel and he was asked to leave the secure area of the airport, he did not.  Flinn Dep. 60:11-17 (stating that she described this to him and he refused to leave multiple times); *see also id.* at 61:10-14 (testifying that probable cause to arrest existed based on Plaintiff's refusal to leave the secured area of the airport).  Flinn testified that her personal observations of Plaintiff's conduct led to his arrest.  *Id.* at 68:2-13 (further stating that she exercised her independent judgment in determining whether to arrest Plaintiff and the information she relied on to arrest Plaintiff was not based solely on information Olson gave her); *id.* at 32:24-33:14, 34:10-15, 36:19-37:6 (explaining that evidence for Plaintiff's trespass arrest was based on Flinn's "dealings with him" and because he was beyond the secured area in an area requiring a boarding pass and he did not have one, his refusal to follow a lawful order to leave the secured area provided evidence for his arrest); *see also* Flinn Decl. ¶ 10 (based on information from Alaska and Plaintiff, Flinn believes she had probable cause to arrest Plaintiff

for the crime of second-degree trespass).

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986).

DISCUSSION

I. Defendants' Motions for Summary Judgment - Probable Cause

Plaintiff's § 1983 Fourth Amendment claim against the Port and Flinn and his state false arrest claim[7] against all Defendants raise the issue of probable cause.  To state a false arrest claim under Oregon law, a plaintiff must establish four elements:  (1) the defendant confined the plaintiff; (2) the defendant must have intended the act that caused the confinement; (3) the plaintiff was aware of the confinement; and (4) the confinement must be unlawful.  *Id.  Carr v. City of Hillsboro*, 497 F. Supp. 2d 1197, 1211 (D. Or. 2007).  It is the plaintiff's burden to show the confinement.  *Id.*  Then, the burden then shifts to the defendant to show that the confinement was not unlawful.  *Id.*  The existence of probable cause "render[s] an arrest lawful as a matter of law."  *Miller v. Columbia Cty.*, 282 Or. App. 348, 355, 385 P.3d 1214, 1220 (2016) (further stating that "under Oregon law, an arrest is lawful if an officer has probable cause to believe that a person has committed a felony or a misdemeanor."), *rev. denied*, 361 Or. 238, 391 P.3d 979 (2017).  "In Oregon, an officer has probable cause to arrest if there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it."  *Carr*, 497 F. Supp. 2d at 1211 (internal quotation marks omitted).

Fourth Amendment law is much the same.  The plaintiff must show there was a seizure, that the person seizing the plaintiff acted intentionally, and that the seizure was unreasonable.

---

[7]  Plaintiff's claim is for "False Arrest and Imprisonment."  *See* Compl. ¶ 21 (title of claim above numbered paragraph).  Oregon treats false arrest and false imprisonment as a single claim, not separate claims.  *Carr v. City of Hillsboro*, 497 F. Supp. 2d 1197, 1211 (D. Or. 2007) (citing *Hiber v. Creditors Collection Serv., Inc.*, 154 OR. App. 408, 413, 961 P.2d 898, 901 (1998)).

*Brower v. Cty. of Inyo*, 489 U.S. 593, 596, 599 (1989) (in § 1983 Fourth Amendment claim, the plaintiff must establish a seizure, that the seizure occurred as the result of "an intentional acquisition of physical control," and that the seizure was unreasonable).  A warrantless arrest supported by probable cause is reasonable under the Fourth Amendment.  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *C.B. v. City of Sonora*, 769 F.3d 1005, 1046 (9th Cir. 2014) (en banc) (Fourth Amendment's reasonableness requirement "generally is satisfied if probable cause exists to believe the person is violating the law.").

"Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152; *see also Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir. 2016) ("Whether probable cause exists depends 'on the totality of facts[.]'") (internal quotation marks omitted). Probable cause does not require law enforcement officers to support their seizure with "certainty or even a preponderance of the evidence," but officers must be able to conclude that there is a "fair probability" that the defendant committed a crime. *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006).  Probable cause is an objective standard. *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008).

The issue of probable cause is one for the court, not a jury. *Peng v. Mei Chin Penghu*, 335 F.3d 970, 979-80 (9th Cir. 2003); *Miller*, 282 Or. App. at 355, 385 P.3d at 1221.  Underlying historical factual disputes may be resolved by a jury, but the ultimate issue of the existence of probable cause is left for the court. *Peng*, 335 F.3d at 979-80 (when "the material historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts, it is appropriate for the court to decide whether probable cause existed").

Under Oregon statute, a person commits the crime of criminal trespass in the second degree if he or she "enters or remains unlawfully . . . in or upon premises." O.R.S. 164.245(1). The crime is a misdemeanor. O.R.S. 164.245(2). "Enter or remain unlawfully" means "[t]o enter or remain in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the entrant is not otherwise licensed or privileged to do so[,]" or "[t]o fail to leave premises that are open to the public after being lawfully directed to do so by the person in charge[.]" O.R.S. 164.205(3)(a), (b).

Defendants argue that Flinn had probable cause to arrest Plaintiff, defeating his false arrest and Fourth Amendment claims. The airport, undisputably owned by the Port, is a "premises" as defined by O.R.S. 164.205(6). It is undisputed that the Port leases space to Alaska, including gate B1. It is undisputed that gate B1 is on the secure side of the airport. It is undisputed that passengers need a current boarding pass or gate-service document to pass through TSA security to the secured portion of the airport. Thus, the secure side of the airport and the gate areas are not "open to the public" under Oregon statute. O.R.S. 164.205(4) (defining "open to the public" to mean "premises which by their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required.").

Defendants contend that because it is undisputed that Plaintiff was unable to board his Phoenix flight and no longer had a current ticket or boarding pass for another flight, he could not remain in the secured portion of the airport. Because it is undisputed that Flinn possessed such information about Plaintiff's status and informed Plaintiff he had to leave, Plaintiff's refusal to do so constituted probable cause for Flinn to arrest him for remaining unlawfully in or upon

premises to which he no longer had a license or privilege to remain. Defendants argue that these undisputed facts establish a "substantial objective basis" and a fair probability for believing that Plaintiff had committed the crime of second degree criminal trespass. I agree with Defendants.

Plaintiff offers a host of contentions in opposition, none of which are persuasive. He cites to the numerous disputed facts regarding whether he called Olson worthless, whether he was told he was bumped from the first-class seat, whether he was late, what time Olson reported his arrival to the gate, whether the flight was oversold, whether he was offered a coach seat, and more. But, in the face of the undisputed facts, none of the disputed facts that Plaintiff relies on are material to the probable cause determination. Plaintiff admits that Flinn was told that Plaintiff was not a ticketed passenger and that the Port police told him that a person is not allowed to remain in the secure area without a ticket. Mersereau Decl., Ex. 1, ECF 25-1 (Pl. Resp. to Alaska's Request for Admission No. 34 stating that at some point, the Port police told him that Alaska had told them that Plaintiff was not a ticketed passenger; Pl. Resp. to Alaska's Request for Admission No. 36 stating that while being interrogated by the Port police, he was told that a person is not allowed to remain in the secured area without a ticket).

Plaintiff admits he did not leave the gate area after being asked to do so. Pl. Dep. 140:8-19 (Plaintiff remembers one of the officers asking him if he was "leaving or not" and he responded that he was trying to get home and "[s]o, you know, I'm not leaving at all."); *see also* Compl. ¶ 10 ("Officer Flinn informed Plaintiff that he was trespassing and ordered him to leave the concourse. Plaintiff refused to leave[.]").[8] Given Plaintiff's own admissions and testimony,

---

[8] Factual allegations in a Complaint are judicial admissions binding on the party who makes them. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988); *Workshops Portland Carson, L.L.C. v. Carson Oil Co.*, No. 3:15-cv-01234-AC, 2017 WL 2901931, at *2

the totality of the material facts possessed by Flinn at the time of Plaintiff's arrest support an objectively reasonable conclusion that there was a fair probability that Plaintiff was committing the crime of second-degree criminal trespass.

Plaintiff also argues that the arrest was tainted under a "fruit of the poisonous tree" theory because Flinn did not have "reasonable suspicion" to initially detain him. Pl. Resp. 28-29. There are several problems with this argument. First, even assuming that Flinn had no lawful basis to stop and talk to Plaintiff in the first place, Plaintiff's argument is not viable in a § 1983 claim. In a 2016 Ninth Circuit case, the court noted that the exclusionary rule prohibits the government from relying on evidence seized during an unlawful search in a criminal trial. *Lingo v. City of Salem*, 832 F.3d 953, 957 (9th Cir. 2016). The "fruit of the poisonous tree" doctrine extends the exclusionary rule to require suppression of other evidence that is derived from the illegal search or seizure. *Id.* at 957-58. Relying on that doctrine, the plaintiff in *Lingo* argued in her § 1983 civil case that the evidence obtained as a result of the illegal entry onto her property was tainted and thus deprived the officers of probable cause to arrest her. The Ninth Circuit joined at least four other circuits in rejecting this argument, explaining that unlike in criminal cases where the purpose of the rule is to remove the incentive for police to violate the Fourth Amendment and incriminate a suspect, the need for deterrence was minimal in § 1983 cases. *Id.* at 958; *see also id.* at 959 (joining the other federal courts of appeals which have "widely held that the exclusionary rule does not apply in § 1983 cases"). *Lingo* forecloses Plaintiff's contention that an allegedly unreasonable stop tainted his subsequent arrest.

---

(D. Or. June 30, 2017) (relying on *American Title* to conclude that the plaintiff was bound by its admissions in its Complaint and in its summary judgment motion). Thus, these allegations in the Complaint are binding on Plaintiff.

Second, Plaintiff's argument that Flinn lacked reasonable suspicion to initially stop and question him is without merit. The Fourth Amendment permits investigatory, or "*Terry*" stops when law enforcement officers have a "reasonable suspicion" that criminal activity "may be afoot." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) (internal quotation marks omitted); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968) (Fourth Amendment applies to investigatory stop short of full arrest). "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). "[P]articularized suspicion encompasses two elements." *Id.* "First, the assessment must be based upon the totality of the circumstances. Second, that assessment must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *Id.* (footnote and citation omitted).

A stop may be founded on reasonable suspicion despite a possible innocent explanation for every police observation. *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000). Moreover, given that the standard for reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity[,]" the "quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *Id.* (internal quotation marks omitted). The "reasonable- suspicion standard is not a particularly high threshold to reach" although more than a "mere hunch" is required. *Valdes-Vega*, 738 F.3d at 1078 (internal quotation marks omitted).

Assuming that Flinn's request for identification is a "stop" in the first place, it is undisputed that before talking to Plaintiff, she obtained information from Olson, including that

Plaintiff was not boarding the Phoenix flight and had no current boarding pass for another flight. There was no question that Plaintiff was in the secure area of the airport at the time. Based on these undisputed facts, Flinn was aware of specific and articulable facts forming a basis for particularized suspicion that Plaintiff may be trespassing. It does not matter that Plaintiff's presence there might have been innocently explained. At the time, Flinn had more than a "mere hunch" that Plaintiff had lost his "license or privilege" to remain in the secure area of the airport.

The undisputed *material* facts show that Flinn had probable cause to arrest Plaintiff. Plaintiff's arguments to the contrary are unavailing. I grant summary judgment to all Defendants on the state law false arrest claim and to the Port and Flinn on the § 1983 Fourth Amendment claim. Because the probable cause issue disposes of the claim against Alaska, I provide no extensive discussion of the issue raised in Alaska's motion addressing Plaintiff's argument that Alaska is liable on the false arrest claim because it instigated that arrest. Even if probable cause were lacking, the facts here are materially indistinguishable from those in *Carr* where in addressing the plaintiff's objections to Judge Stewart's Findings & Recommendation, Judge Haggerty rejected the plaintiff's argument that the defendant school district was jointly liable for causing the plaintiff's false arrest by "instigating his imprisonment through false and misleading information which was presented to the [City] police department." *Carr*, 497 F. Supp. 2d at 1203. Even if probable cause existed, Judge Haggerty stated, Oregon law did not support the plaintiff's argument. *Id.* He explained that

> "Instigation consists of words or acts which direct, request, invite or encourage the false imprisonment itself. In the case of an arrest, it is the equivalent, in words or conduct, of 'Officer, arrest that man!' It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision

as to what shall be done about any arrest, without persuading or influencing them .
. . ."

*Id.* (quoting *Pearson v. Galvin*, 253 Or. 331, 454 P.2d 638, 641 (1969)).  In *Carr*, because the

school district presented police with information available at the time, and then let the City

decide how to resolve the situation, there was no basis for "instigator" liability for the school

district.  *Id.*  The undisputed facts here show that at the time the Port police confined or arrested

Plaintiff, he had been unable to board the Phoenix flight, he had no valid boarding pass for any

flight, he had no valid ticket for any flight, the secured area is for ticketed passengers only,

Plaintiff was asked to leave, and Plaintiff refused to do so.  Given Flinn's undisputed testimony

that she made the decision to arrest Plaintiff when he did not leave the secured area on his own,

Alaska cannot be liable on an instigator theory.

## II.  Port Defendants' Motion for Summary Judgment - First Amendment and Other Claims

### A.  First Amendment Claim

Plaintiff alleges that his arrest was in retaliation for his asking Flinn for her identification.

Compl. ¶ 17.  To succeed on a First Amendment retaliatory arrest claim, Plaintiff must first

"demonstrate that the officers' conduct would chill a person of ordinary firmness from future

First Amendment activity."  *Ford v. City of Yakima,* 706 F.3d 1188, 1193 (9th Cir. 2013).

Second, he must "prove that the officers' desire to chill his speech was a but-for cause of their

allegedly unlawful conduct."  *Id.*

In response to Plaintiff's request for the Port police officers' identification, Plaintiff does

not dispute Flinn's testimony that she pointed to her security badge which contained her full

name. There is no dispute that the other officers, whom Plaintiff states "made clear they weren't

gonna say a word about who they were[,] Pl. Dep. 135:19-20, were not involved in the decision

to arrest Plaintiff. Thus, it is Flinn's motive which is at issue in this claim. The only facts

Plaintiff relies on in opposing the motion against this claim are that the Port police would not

allow him to tell his side of the story and controlled his speech in its "criminal investigation." Pl.

Resp. 36 (citing Pl. Dep. 139-40[9]). His only argument is that "[b]ecause probable cause did not

exist to arrest Plaintiff for trespass, or any other crime, a reasonable factfinder could conclude

that Plaintiff was arrested as a result of his First Amendment protected speech, including his

request to see Officer Flinn's identification." *Id.*

Plaintiff's argument and evidence are insufficient to defeat the Port Defendants' motion

against the First Amendment claim. First, and somewhat confusingly, Plaintiff took the position

in discovery that his arrest was exclusively caused by comments made by Alaska personnel.

Mersereau Decl., Ex. 2, ECF 25-2 (Pl. Resp. to Interrog. No. 6 stating "The arrest was at the

direction of Alaska and solely off of statements made by Alaska"; Pl. Resp. to Interrog. No. 20

stating "The Port of Portland arrested me for trespass based on statements made by Defendant

---

[9] In his citations to deposition testimony throughout his Response Memorandum, Plaintiff fails to cite to any particular line in the cited pages. In addition to violating the relevant Local Rule of Civil Procedure, L.R. 56-1(a) (requiring a party's factual positions to be supported by "page *and line as appropriate*," (emphasis added)), failing to provide a cite to a specific line creates an unnecessary burden on the Court to locate the exact testimony relied on. Here, Plaintiff cites to two pages of his own narrative testimony, unbroken by any questions, given in response to a question on page 138 asking "[b]efore the conversation about names (presumably referring to requests for identification)], had there been any discussion in the group about seats and availability on the aircraft?" Pl. Dep. 138:13-15. Plaintiff's response elaborates on what he believes to be good police practices in conducting interviews during which at some point he stated: "[t]hat didn't happen. We never got to anybody's story or anybody has this or here's what's going on here or where's what they explained to be or any of that." *Id.* at 138:25-140:2. I assume this is the testimony Plaintiff relies on in his Response Memorandum. Although I do not find this testimony to reasonably support Plaintiff's assertion that the Port police controlled and directed his speech, I accept his interpretation for the purposes of this Opinion.

23 - OPINION & ORDER

Alaska, and those statements alone"; Pl. Resp. to Interrog. No. 21 stating "I was arrested based on the statements of Alaska employees, and these statements alone").

Second, the only evidence of causation is that Plaintiff was arrested sometime after asking to see Flinn's identification. The fact of an arrest after speaking to an officer, without more, is insufficient to create a genuine issue of material fact regarding the "but-for" cause requirement. Plaintiff does not allege that Flinn displayed any hostility toward him or reacted negatively in response to his request to see her identification. He alleges only that the officers directed the conversation and did not allow him to tell his side of the story. This does not create an issue of fact regarding causation. *See Rosenfeld v. Corvallis Police Dep't*, No. 6:08-cv-06106-AA, 2013 WL 1857108, at *5 (D. Or. May 1, 2013) (granting summary judgment to police defendant on First Amendment retaliatory arrest claim where the plaintiff was critical of the officers' actions and threatened to have them fired but there was no evidence of a retaliatory motive and thus, a "reasonable jury could not conclude that defendant's actions were motivated by anything other than plaintiff's failure to comply with Officer Harvey's orders").

Third, probable cause has a "high probative force" in deciding whether a plaintiff has satisfied the causation element of a retaliatory arrest claim. *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 901 (9th Cir. 2008) (internal quotation marks omitted). First Amendment claims with strong evidence of probable cause and weak evidence of retaliatory motive should not survive summary judgment. *See id.* (explaining that cases with "strong evidence of probable cause and very weak evidence of retaliatory motive" are distinguishable from cases with weak evidence of probable cause and strong evidence of retaliatory motive which survive summary judgment). Here, no evidence indicates that the Port Defendants desired to chill Plaintiff's

speech or that any such desire was the but-for cause of Plaintiff's arrest. I grant summary judgment to the Port Defendants on the First Amendment claim.

### B. Other Claims

#### 1. Due Process & Violation of Port Policies

In addition to the § 1983 First and Fourth Amendment claims, Plaintiff's First Claim for Relief against the Port and Flinn appears to raise an undefined due process claim and a claim based on a violation of Port policies. Compl. ¶ 16 (alleging that his arrest and imprisonment "without probable cause and without following the Port's own procedures for excluding someone from the airport, unlawfully deprived him of liberty without due process under [the] Fourth and Fourteenth Amendments to the United States Constitution"). Neither of these claims are viable. First, § 1983 claims must be based on an alleged violation of *federal* constitutional or statutory law, not on an alleged violation of state or local law or policy. *Smith v. City & Cty. of Honolulu*, 887 F.3d 944, 952 (9th Cir. 2018) ("A claim for violation of state law is not cognizable under § 1983") (internal quotation marks omitted); *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 370 (9th Cir. 1996) ("Section 1983 limits a federal court's analysis to the deprivation of rights secured by the federal "'Constitution and laws'"). Thus, to the extent Plaintiff bases his § 1983 claim on a violation of Port policy, the claim is dismissed.

Second, Plaintiff fails to allege how his due process rights were violated. The Complaint contains facts asserting a claim for unreasonable seizure under the Fourth Amendment and retaliatory arrest under the First Amendment. The facts do not support a due process claim. *Addison v. City of Baker City*, 258 F. Supp. 3d 1207, 1235–36 (D. Or. 2017) (analyzing First Amendment retaliation claim by newspaper reporter against city under the First Amendment, not

the Fourteenth Amendment's due process clause because the plaintiff could not "double up" on

his constitutional claims); *Stroud v. Thalacker*, No. CIV. 10-6171-HO, 2011 WL 1871395, at *9

(D. Or. May 16, 2011) (claim alleging an arrest without probable cause is examined under the

Fourth Amendment, not the due process clause of the Fourteenth Amendment) (citing *Albright v.

Oliver*, 510 U.S. 266, 281 (1994)). To the extent Plaintiff attempts to bring a due process claim

separate from his First and Fourth Amendment claims, it is dismissed.

### 2. Port Liability for Constitutional Violations

In opposing the summary judgment motions, Plaintiff makes an argument in support of a

§ 1983 claim against the Port. Pl. Resp. 37-39 (discussing liability of the Port under *Monell v.

Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). This theory of liability is unavailing for three

reasons. First, the Port has no liability if there has been no underlying constitutional violation.

*City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (a *Monell* claim cannot survive in the

absence of an underlying constitutional violation).

Second, Plaintiff failed to plead any allegations supporting a *Monell* claim in his

Complaint. Because respondeat superior liability cannot support a *Monell* claim, Plaintiff must

show that a Port custom or policy caused a violation of his constitutional rights. *Monell*, 436

U.S. at 690. To establish an official policy or custom sufficient for *Monell* liability, a plaintiff

must show a constitutional right violation resulting from (1) an employee acting pursuant to an

expressly adopted official policy; (2) an employee acting pursuant to a longstanding practice or

custom; or (3) an employee acting as a final policymaker. *Webb v. Sloan*, 330 F.3d 1158, 1164

(9th Cir. 2003). Plaintiff's Complaint contains no custom or policy allegations. Plaintiff may not

raise allegations for the first time in a summary judgment response. *Karnes v. Regence*

*Bluecross Blueshield of Or*, No. CIV. 10-1059-ST, 2011 WL 1402825, at *1 (D. Or. Apr. 12, 2011) ("Plaintiff may not raise allegations for the fist time in her response to a summary judgment motion") (citing *Wasco Prods., Inc. v.. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.")).

Third, in his Response Memorandum, Plaintiff offers only conclusory assertions that Flinn is a policymaker or that the Port ratified her conduct. He fails to support either theory with any facts. Thus, to the extent Plaintiff raises a claim of *Monell* liability against the Port, the claim is denied.

### CONCLUSION

The Port Defendants' motion for summary judgment [23] and Alaska's motion for summary judgment [20] are granted. The claims against the two Doe Defendants are dismissed because Plaintiff has made no attempt to amend the Complaint to name them even though their identifies have been discovered. *See Becker v. Oregon*, 170 F. Supp. 2d 1061, 1069 (D. Or. 2001) (dismissing Doe defendants who remained unnamed even after discovery and amendments to the complaint had been made).

IT IS SO ORDERED.

Dated this ____6____ day of ____July____, 2018

Marco A. Hernandez
United States District Judge